<div style="border:1px solid black">

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CLEAN WATER ACTION, | ) | |
| PLAINTIFF | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 13-328 Erie |
| | ) | |
| WASTE TREATMENT CORPORATION, | ) | |
| DEFENDANT | ) | |

**COMPLAINT**

</div>

### Nature Of The Case

1.  This is a citizen suit brought under the Clean Water Act and the Endangered Species Act. Clean Water Action seeks declaratory and injunctive relief, the assessment of penalties, and an award of litigation costs and fees, to address Waste Treatment Corporation's violations of its NPDES permit, unauthorized discharges, violations of the Clean Water Act and Pennsylvania Clean Streams Law, and unlawful taking of the endangered Northern Riffleshell mussel.

### Jurisdiction & Venue

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(c) & (g) (Endangered Species Act), and 33 U.S.C. § 1365(a) (Clean Water Act).

3.  This Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 & 2202.

4.  Clean Water Action gave notice of the violations alleged in this Complaint, and their intent to file suit, on July 18, 2013, prior to commencement of this lawsuit. Clean Water Action provided such notice to Waste Treatment Corporation and all other required parties. A copy of the notice letter is attached as Exhibit 1 and incorporated herein.

5.  More than sixty (60) days have passed since Clean Water Action served notice. The violations complained of in the notice have not ceased.

6. Venue is proper in this judicial district because Waste Treatment Corporation resides in this district and because a substantial part of the events or omissions giving rise to the claims occurred there. 28 U.S.C. § 1391(b)(1) & (2). Waste Treatment Corporation resides in Warren County. 28 U.S.C. § 1391(c)(2). The unlawful discharges giving rise to the claims occurred at and around Waste Treatment Corporation's wastewater treatment plant, which is located in Warren County.

7. Venue is proper in this judicial district because the source of the unlawful discharge is located there. 33 U.S.C. § 1365(c)(1).

8. Venue is proper in this judicial district because the unlawful take of a species occurred there. 16 U.S.C. § 1540(g)(3)(A).

## Parties

9. Defendant, Waste Treatment Corporation, is a domestic business that was incorporated in the Commonwealth of Pennsylvania on May 10, 1985 with the following registered office address: RD 1, CLARENDON, PA 16313. Waste Treatment Corporation's Pennsylvania Department of State corporate entity number is 866213. Waste Treatment Corporation's principal place of business is Warren County, Pennsylvania.

10. Waste Treatment Corporation is the owner and operator of a centralized waste treatment facility also called Waste Treatment Corporation and referred to in this Complaint as the "WTC Plant." The WTC Plant is located at 341 West Harmar Street, Warren, PA, 16365.

11. Plaintiff, Clean Water Action, is a non-profit, member-based organization incorporated and organized under the laws of Washington, D.C. Clean Water Action is a national organization with a member base of over one million. Clean Water Action has approximately 100,000 members in Pennsylvania and maintains three offices in the Commonwealth: Pittsburgh, Harrisburg, and Philadelphia. Clean Water Action's purposes are to empower people to take action to protect America's waters, to build healthy communities, and to make democracy work for the community through advocacy and litigation.

12. Clean Water Action has approximately 150 members who reside in the Warren area. Clean Water Action and its members have aesthetic and recreational interests in the Allegheny River in Warren, Pennsylvania, and Clean Water Action members reside in the vicinity of the WTC Plant. Clean Water Action and its members have suffered injuries, are presently suffering injuries, and will continue to suffer injuries that are traceable to the activities of the WTC Plant that are alleged in this Complaint. Clean Water Action and its members have suffered, are presently suffering, and will continue to suffer, actual and threatened injury to their health and welfare due to the violations of the Clean Water Act, Pennsylvania Clean Streams Law, and Endangered Species Act, as described in this Complaint. Clean Water Action has members who have stopped recreating in the area around the WTC Plant as a result of its activities; and whose enjoyment of the Allegheny River, the organisms that depend on it, and the organisms who reside in and around it, has diminished as a result of Waste Treatment Corporation's activities. Without redress for those violations, Clean Water Action and its members will continue to suffer injuries. Providing the relief requested by Clean Water Action in this Complaint will redress those injuries.

13. Neither the claims asserted nor the relief requested in this Complaint requires the participation of any individual member of Clean Water Action.

14. The interests that Clean Water Action seeks to protect are germane to its purpose.

### Legal background

*The Clean Water Act and the Pennsylvania Clean Streams Law*

15. The goal of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

16. The Environmental Protection Agency administers the Clean Water Act within the context of cooperative federalism. While always retaining its oversight role, the Agency can delegate administration of parts of or all of the statute to states.

17. Under Section 402(b), the Administrator of the Environmental Protection Agency has authorized the Pennsylvania Department of Environmental Protection ("Pennsylvania DEP") to

administer various aspects of the Clean Water Act, including the issuance of National Pollutant Discharge Elimination System ("NPDES") permits. 33 U.S.C. § 1342(b). The applicable Pennsylvania law is Title 35 Pennsylvania Statutes § 691.1, et seq., otherwise known as the Clean Streams Law. Most of the applicable state regulations are at Title 25 Chapters 91-96 of the Pennsylvania Code. 25 Pa. Code Chs. 91-96.

18. The Pennsylvania DEP is the Commonwealth agency that administers the NPDES permitting program.

*Authorizing discharges through NPDES permits*

19. Section 301(a) of the Clean Water Act, prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with various enumerated sections of the law. 33 U.S.C. § 1311(a). Among other things, Section 301(a) prohibits such discharges not authorized by or in violation of the terms of a NPDES permit issued pursuant to Section 402 of the statute. 33 U.S.C. § 1342.

20. Like Section 301 of the federal statute, Section 301 of the Clean Streams Law, prohibits the discharge of "industrial wastes" into the waters of the Commonwealth, unless such discharge is in compliance both with the terms and conditions of a permit issued by the Commonwealth, and with the rules, regulations, and orders of the Commonwealth. 35 P.S. § 691.301.

21. A NPDES permit authorizes the discharge of only those pollutants contained in a wastestream disclosed in a permit application or specific pollutants disclosed in a permit application, and where the permitting agency has not expressly prohibited the wastestreams or pollutants. 33 U.S.C. § 1342(k); 25 Pa. Code § 92a.6.

22. A change in wastestream, including the introduction of new or increased concentrations of pollutants in a wastestream, requires approval from the permitting agency and public participation in the permitting process before commencement of the discharge. 40 C.F.R. §§ 122.62-63, 125.25(a)(25), 124.5; 25 Pa. Code §§ 92a.2, 21, 24.

23. Final permit authorizations, including an amendment or modification due to a change in wastestream, require submission of an application to the permitting agency, preparation of a draft

permit and fact sheet or statement of basis by the agency, a public notice and comment period, and agency consideration of public comment. 33 U.S.C. § 1342(b)(3); 40 C.F.R. §§ 122.44, 124.6, 8, 11, 56; 25 Pa. Code §§ 92a.2, 21, 24.

*Protected uses of Pennsylvania waterbodies*

24. Section 101 of the Clean Water Act provides that one of the law's goals is "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water...." 33 U.S.C. § 101(a)(2) (implemented in part by Section 303 that requires protection of those use goals, 33 U.S.C. § 1313).

25. In administering the Clean Water Act, Pennsylvania is required to establish water quality standards. 33 U.S.C. §§ 1301(a)(2), 1311(b)(1)(C), 1313(c)(2)(A) & (e)(3)(A).

26. Water quality standards consist of three elements: the use or uses of a waterbody; the water quality criteria necessary to protect those uses; and an antidegradation policy. 40 C.F.R. § 131.6.

27. A designated use is simply one that is formally specified in the water quality standards as codified into law. 40 C.F.R. § 131.3(f); 25 Pa. Code § 93.1.

28. An existing use is any use that the waterbody was attaining on or after the reference date of November 28, 1975. 40 C.F.R. § 131.3(e); 25 Pa. Code § 93.1.

29. All designated and existing uses must be protected. 40 C.F.R. § 131.12; 25 Pa. Code §§ 93.3, 93.4, 93.4a(b).

30. In Pennsylvania, there are several protected water uses, including an Aquatic Life Use. 25 Pa. Code § 93.3. Protected uses can be either designated or existing..

31. There are four categories of protected Aquatic Life Use, and the relevant one in this case is Warm Water Fishes, meaning the waterbody has to sustain the "maintenance and propagation of fish species and additional flora which are indigenous to a warm water habitat." 25 Pa. Code § 93.3.

32. Pennsylvania has established two varieties of water quality criteria in order to protect uses such as Warm Water Fishes: general and specific. 25 Pa. Code § 93.6-7.

33. General water quality criteria are narrative in form. One general criterion protects a waterbody from having "substances…in concentration or amounts sufficient to be inimical or harmful to the water uses protected or to human, animal, plant or aquatic life." 25 Pa. Code § 93.6(1). The other general criterion requires control of substances such as "floating materials, oil, grease, scum, and substances that produce color, tastes, odors, turbidity or settle to form deposits." 25 Pa. Code § 93.6(2).

34. Specific water quality criteria are numeric in form. They require that the levels or concentrations of certain pollutants in a waterbody be limited to avoid impairing a protected use, such as Warm Water Fishes. 25 Pa. Code § 93.7.

35. The segment of the Allegheny River that is the receiving stream of the WTC Plant's discharge has at least three designated uses: Warm Water Fishes; Water Supply (including Potable Water Supply, Industrial Water Supply, Livestock Water Supply, Wildlife Water Supply, Irrigation); and Recreation (including Boating, Fishing, Water Contact Sports, Esthetics).

*Regulation of Centralized Waste Treatment facilities*

36. Specific effluent guidelines exist for centralized waste treatment facilities such as the WTC Plant. 40 C.F.R. Part 437.

37. A centralized waste treatment facility is one that "treats (for disposal, recycling or recovery) any hazardous or non-hazardous industrial wastes, hazardous or non-hazardous industrial wastewater, and/or used material received from off-site." 40 C.F.R. § 437.2(c).

38. Technology-based effluent limitation guidelines for centralized waste treatment facilities exist for wastewater derived from the following four categories of waste: Metals Treatment and Recovery (also known as Subpart A Metals waste); Oils Treatment and Recovery (also known as Subpart B Oils waste); Organics Treatment and Recovery (also known as Subpart C Organics waste); and Multiple Wastestreams (also knows as Subpart D Mixed waste). 40 C.F.R. Part 437, Subparts A-D.

*The Endangered Species Act and unlawful take of protected species*

39. Among the purposes of the Endangered Species Act are to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

40. Without a permit or other authorization, Section 9 of the Endangered Species Act makes it "unlawful for any person subject to the jurisdiction of the United States to take any such species within the United States." 16 U.S.C. § 1538(a)(1)(B).

41. The word "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

42. The word "harm" means "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. The acts can include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

43. The word "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*

44. Without a permit or other authorization, Section 9 also prohibits the violation of "any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant [the Endangered Species Act]." 16 U.S.C. § 1538(a)(1)(G).

*Citizen suit authorization under federal and state law*

45. Section 505 of the Clean Water Act authorizes any citizen to "commence a civil action on his own behalf against any person...who is alleged to be in violation of [] an effluent standard or limitation under this chapter[]." 33 U.S.C. § 1365(a). An "effluent standard or limitation" is defined to include unlawful acts under Section 301(a) of the Clean Water Act; an effluent limitation under Section 301 or 302 of the Clean Water Act; the terms and conditions of a NPDES permit issued pursuant to Section 402 of the Clean Water Act; and prohibition, effluent

standards, or pretreatment standards under Section 307 of the Clean Water Act. 33 U.S.C.
§§ 1365(f)(1), (2), (4), and (6).

46. Section 601(c) of the Pennsylvania Clean Streams Law authorizes "any person having an interest which is or may be adversely affected [to] commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act against…any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act." 35 P.S. § 391.601(c).

47. Section 11(g) of the Endangered Species Act authorizes "any person [to] commence a civil suit on his own behalf to enjoin any person…who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof[]." 16 U.S.C. § 1540(g).

### Factual background

*Waste Treatment Corporation's 2003 Permit*

48. Upon information and belief, Waste Treatment Corporation has been operating the WTC Plant since the 1980s.

49. The WTC Plant is located in the City of Warren in Warren County, Pennsylvania.

50. The WTC Plant discharges into the Allegheny River.

51. There are three outfalls in total. Outfall 101 and Outfall 201 are internal outfalls each of which contributes wastewater treated by the WTC Plant to a third outfall, Outfall 001. Outfall 001 discharges treated wastewater from the internal outfalls into the Allegheny River at River Mile 188.6. No additional treatment occurs after the wastewater leaves the internal outfalls.

52. Waste Treatment Corporation operates the WTC Plant under an administratively-extended NPDES permit issued by the Pennsylvania DEP in 2003 ("2003 Permit"). The 2003 Permit is attached as Exhibit 2 and incorporated herein.

53. In its 2000 application ("2000 Application") for a NPDES permit (the permit issued in 2003), Waste Treatment Corporation stated that it treated "residual wastes" that included "wastes from oil and gas wells, a paint manufacturing industry, municipal drinking water treatment

facility (sludge), a titanium source, & sewage treatment plant facility (sludge)." The 2000 Application is attached as Exhibit 3 and incorporated herein.

54. The 2003 Permit prohibits Waste Treatment Corporation from discharging wastewater resulting from anything other than the acceptance and treatment of Subcategory A Metals wastes. Exhibit 2, 2003 Permit, at Part C, § II.1 (page 17 of 21).

55. Due to past violations of its 2003 Permit, in 2011 the Pennsylvania DEP entered into a Consent Order & Agreement (a Commonwealth administrative settlement) with Waste Treatment Corporation. The 2011 Consent Order & Agreement required Waste Treatment Corporation to pay a fine for past violations, but did not address future violations in any meaningful way, such as by requiring improvements in the treatment process to prevent further violations of numeric effluent limitations. The 2011 Consent Order & Agreement is attached as Exhibit 4 and incorporated herein.

*The impact on the Allegheny River of Waste Treatment Corporation's discharges*

56. As described more fully below, Waste Treatment Corporation has been discharging certain pollutants in violation of the effluent limits in its 2003 Permit, and without authorization has been discharging Oil & Gas Wastewater that contains harmful concentrations of chloride and other pollutants.

57. In an Aquatic Biology Investigation dated January 10, 2013, the Pennsylvania DEP evaluated the impact of the WTC Plant's discharges on the Allegheny River. The Aquatic Biology Investigation is attached as Exhibit 5 and incorporated herein.

58. The Investigation included an analysis of the macroinvertebrate population in the river, the sediment, and the water chemistry.

59. The health and well-being and composition of a macroinvertebrate population can determine whether a stream is able to support its particular Aquatic Life Use.

60. The Pennsylvania DEP characterizes macroinvertebrate communities using something called an Index of Biological Integrity or IBI score, which ranges from 0 to 100: higher scores indicate better quality as well as the ability for the waterbody to attain certain protected uses. A

score at or above 63 indicates that a stream is able to attain its designated Aquatic Life Use. A score between 50 and 63 indicates that a stream may not be able to attain its designated Aquatic Life Use. A score below 50 indicates that a stream is not attaining its designated Aquatic Life Use, and as such is impaired as to that use. *See* Exhibit 5, Aquatic Biology Investigation, at 4-7.

61. In Pennsylvania, the IBI score functions like a water quality criterion for existing and designated uses. When the criterion cannot be achieved, the use is impaired and the water quality standard is violated.

62. The IBI Score at sampling stations downstream of the WTC Plant discharge were well below 50: 25.8 at the station located 55 meters downstream of the discharge point, and 45.5 at the station located 400 meters downstream of the discharge point.

63. In terms of water chemistry, the Pennsylvania DEP concluded that "[m]any of the parameters tested within the [WTC Plant] discharge were high compared to background." 7. Among the parameters with such high concentrations were chlorides and total dissolved solids. *Id.*

64. The Aquatic Biology Investigation also found that the instream measurement of osmotic pressure approximately 50 meters downstream of the WTC Plant discharge was 126 milliosmoles per kilogram, which greatly exceeded the water quality criterion of 50. As far as 400 meters downstream, the measurement of osmotic pressure was 49, nearly exceeding the criterion. *Id.* at 8.

65. In terms of sediment, the Aquatic Biology Investigation found sediment deposits that were black, oily, and that had a petroleum odor. *Id.* at 9. The Pennsylvania DEP also found in the sediment elevated levels of radionuclides such as radium 226 and radium 228. *Id.*

66. The Aquatic Biology Investigation concluded that "the [Waste Treatment Corporation] discharge is negatively impacting the macroinvertebrate community of the receiving stream." The Pennsylvania DEP specifically stated that "[w]ater chemistry from the [WTC Plant] discharge is certain affecting the biotic community downstream...." *Id.*

67. Since December 2011, based on discharge monitoring reports, Waste Treatment Corporation has reported maximum daily chloride concentrations 25 times with an average concentration of 80,394.20 milligrams per liter, a high concentration of 131,725 milligrams per liter, and a low concentration of 65,500 milligrams per liter. That can be compared to seawater, which often contains approximately 19,000 milligrams per liter of chloride. Ken W.F. Howard and Rauf G. Israfilov (eds.), *Current Problems of Hydrogeology in Urban Areas, Urban Agglomerates and Industrial Centres*, 486 (2002).

*The alleged violations are continuing*

68. The violations alleged in this Complaint have occurred, are continuing, and will continue unless the relief requested is granted.

69. The violations alleged in this Complaint are continuous, or they are intermittent or sporadic and have a continuing likelihood of recurrence.

*No action taken by the Pennsylvania DEP statutorily precludes this citizen suit*

70. On September 16, 2013, the Pennsylvania DEP filed a Praecipe For A Writ Of Summons ("Praecipe") with the Commonwealth Court in Pennsylvania, and named WTC as the defendant. The docket number is 463 MD 2013. The Praecipe materials are attached as Exhibit 6 and incorporated herein.

71. As indicated in the cover letter to the Chief Clerk in Exhibit 6, WTC had already agreed to accept service directly from the Pennsylvania DEP. The cover letter copies WTC's attorney for this matter, Mr. Matthew L. Wolford, Esq.

72. The Praecipe and Writ contain no factual or legal allegations (other than the statement in the Writ notifying WTC that the Pennsylvania DEP has commenced an action against it), no alleged violations of the law, and no request for relief of any kind. Neither document refers to the Clean Water Act, the Pennsylvania Clean Streams Law, or the Endangered Species Act. Neither document refers to any information contained in the Plaintiff's notice of intent to sue.

73. As to express factual and legal allegations, express allegations about violations of the law, and express requests for relief, there is no overlap at all between the Praecipe and this Complaint.

74. The Pennsylvania DEP has not "commenced…a civil or criminal action in a court of…a State *to require compliance with* the standard, limitation, or order…." 33 U.S.C.A. § 1365(b)(1)(B) (emphasis added). Nor is the Pennsylvania DEP "diligently prosecuting" any such action. *Id.*

75. In addition, the 2011 Consent Order & Agreement is not the kind of "administrative penalty" or other kind of "action" that, pursuant to Section 309(g), has preclusive effect on this civil action.

76. In order to preclude a citizen suit under Section 505 of the Clean Water Act, the Pennsylvania DEP would have had to commence an action to require compliance *and* be diligently prosecuting that action. 33 U.S.C.A. § 1365(b). Because neither has occurred, the civil action initiated by this Complaint, as it relates to violations of the Clean Water Act and Pennsylvania Clean Streams Law, can move forward.

77. Because a state's enforcement activities would have no statutory preclusive effect on a citizen suit brought in federal court pursuant to the Endangered Species Act, the civil action initiated by this Complaint, as it relates to violations of the Endangered Species Act, can move forward.

### Violations of the Clean Water Act and Pennsylvania Clean Streams Law

FIRST COUNT
*Discharges of pollutants in violation of the numeric effluent limitations
in the 2003 Permit*

78. Plaintiff realleges and incorporates by reference herein all above allegations and all afore-mentioned exhibits.

79. Despite the 2011 Consent Order & Agreement between Waste Treatment Corporation and the Pennsylvania DEP, Waste Treatment Corporation has violated numerous times various

numeric effluent limitations from its 2003 Permit. A table documenting specifically the violations for each pollutant is attached as Exhibit 7 and incorporated herein.

80. For Internal Outfalls 101 and 201, the 2003 Permit has the following numeric effluent limitation for pH: minimum of 6, maximum of 9.0. Waste Treatment Corporation violated that numeric effluent limitation 17 times from November 2009 to June 2013. *See* Exhibit 7.

81. For Internal Outfalls 101 and 201, the 2003 Permit has the following numeric effluent limitation for Titanium: 0.0947 milligrams per liter as a daily maximum; 0.0618 milligrams per liter as a monthly average. Waste Treatment Corporation violated that numeric effluent limitation 244 times from February 2011 to July 2013. *See* Exhibit 7.

82. For Internal Outfalls 101 and 201, the 2003 Permit has the following numeric effluent limitation for Arsenic: 0.162 milligrams per liter as a daily maximum; 0.104 milligrams per liter as a monthly average. Waste Treatment Corporation violated that numeric effluent limitation 188 times from April 2010 to November 2011. *See* Exhibit 7.

83. Since violations of average effluent limitations encompass a full calendar month, a single violation of a monthly average limit is treated as a violation for each day of the month.

84. The violations the effluent limitations in the 2003 Permit are violations of the Clean Water Act and the Pennsylvania Clean Streams Law.

85. Discharging these pollutants at levels that exceed the effluent limitations may be harmful to human health and the environment, especially the aquatic life of the Allegheny River.

SECOND COUNT
*Violation of the 2003 Permit's limitation
on acceptance of wastestreams*

86. Plaintiff realleges and incorporates by reference herein all above allegations and all afore-mentioned exhibits.

87. The 2003 Permit expressly prohibits Waste Treatment Corporation from accepting wastes that are not Subcategory A Metals wastes. Part C, § II.1 (page 17 of 21).

88. While effluent limitations exist for the three other categories of waste, the Pennsylvania DEP in the 2003 Permit expressly forbade Waste Treatment Corporation from accepting, treating, and discharging Subcategory B Oils waste, Subcategory C Organics waste, and Subcategory D Mixed waste.

89. In the 2000 Application, Waste Treatment Corporation stated its intent to accept and treat waste that results from oil and gas development, and to discharge it as wastewater effluent ("Oil & Gas Wastewater").

90. Subcategory A Metals waste is defined as:

> Wastes and/or used materials from manufacturing or processing facilities or other commercial operations that contain significant quantities of metal pollutants, but not significant quantities of oil and grease (generally less than 100 mg/L). Examples of these wastes are spent electroplating baths and sludges, metal-fishing rinse water and sludges, chromate wastes, blow-down water and sludges from air pollution control, spend anodizing solutions, incineration air pollution control wastewaters, waste liquid mercury, cyanide containing wastes greater than 136 mg/L, and waste acids and bases with or without metals.

40 C.F.R. § 437.2(l).

91. Upon information and belief, waste from oil and gas development may arguably be Subcategory B Oils waste or Subcategory C Organics waste, but it is certainly not Subcategory A Metals waste.

92. Since the issuance of the 2003 Permit, each time that Waste Treatment Corporation has accepted and treated for discharge a waste other than Subcategory A Metals waste, it has violated the 2003 Permit. Each such instance of a permit violation constitutes a violation of both the Clean Water Act and Pennsylvania Clean Streams Law.

THIRD COUNT
*Unauthorized discharge of wastewater
derived from oil and gas waste*

93. Plaintiff realleges and incorporates by reference herein all above allegations and all afore-mentioned exhibits.

94. Waste Treatment Corporation's discharges of wastewater are discharges of pollutants from a point source into waters of the United States within the meaning of Section 301 of the Clean Water Act, and into waters of the Commonwealth within the meaning of Section 1 of the Clean Streams Law. 33 U.S.C. § 1311; 35 P.S. § 691.1.

95. As a result of the permit condition forbidding Waste Treatment Corporation from accepting and treating anything other than Subcategory A waste, the 2003 Permit has never authorized and does not currently authorize the discharge of wastewater derived from oil and gas waste, or Oil & Gas Wastewater.

96. Upon information and belief, in its 2000 Application, Waste Treatment Corporation did not seek authorization to discharge significant concentrations of chloride based on any waste source other than oil and gas development.

97. Upon information and belief, Waste Treatment Corporation has been discharging, and continues to discharge, Oil & Gas Wastewater that contains harmful concentrations of chloride.

98. Each of Waste Treatment Corporation's unauthorized discharges of Oil & Gas Wastewater is a separate violation of Section 301(a) of the Clean Water Act and Sections 301 and 401 of the Clean Streams Law for each day on which it occurred. 33 U.S.C. § 1311(a); 35 P.S. §§ 691.301 and 691.401.

99. Discharging Oil & Gas Wastewater may be harmful to human health and the environment, especially the aquatic life of the Allegheny River, and may negatively impact the protected Warm Water Fishes and Recreation uses.

FOURTH COUNT
*Violation of the 2003 Permit's requirement to minimize or prevent
harm to human health or the environment*

100.    Plaintiff realleges and incorporates by reference herein all above allegations and all afore-mentioned exhibits.

101.    The 2003 Permit requires Waste Treatment Corporation to "take all reasonable steps to minimize or prevent any discharge, sludge use or disposal in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment." Part B, § I.E. (page 13 of 21).

102.    The violations alleged in this Complaint had and continue to have a reasonable likelihood of adversely affecting human health and the environment.

103.    Upon information and belief, Waste Treatment Corporation has not taken all reasonable steps to minimize or prevent discharges that violate the 2003 Permit and that have a reasonable likelihood of adversely affecting the environment

**Violations of the Endangered Species Act**

FIFTH COUNT
*Unlawful taking of an endangered species*

104.    Plaintiff realleges and incorporates by reference herein all above allegations and all afore-mentioned exhibits.

105.    The Northern Riffleshell mussel is an endangered species pursuant to the Endangered Species Act. 50 C.F.R. § 17.11(h) (see table).

106.    According to a 2011 letter from the Fish and Wildlife Service of the United States Department of the Interior to the Pennsylvania DEP ("USFWS 2011 Letter To Pennsylvania DEP"), the endangered Northern Riffleshell mussel is located in the Allegheny River in the vicinity of Waste Treatment Corporation's external outfall. The Fish and Wildlife Service letter is attached as Exhibit 8 and incorporated herein.

107.    The Allegheny River basin is unique because while mussel populations have been extirpated in most other places in the United States, the Allegheny River remains home to species like the Northern Riffleshell. *Id.* at § 1.

108.    Mussels are extremely sensitive to chloride. Patricia L. Gillis, *Assessing the toxicity of sodium chloride to the glochidia of freshwater mussels: Implications for salinization of surface waters*, ENVIRONMENTAL POLLUTION Vol. 159(6) (Jun. 1, 2011).

109.    As measured near the outfall, instream concentrations of chloride cannot exceed 27 milligrams per liter without harming or harassing the Northern Riffleshell itself or its habitat. *See* Exhibit 8, USFWS 2011 Letter To Pennsylvania DEP, at 2.

110.    According to the Pennsylvania DEP's Aquatic Biology Investigation, the instream chloride concentration was 2,725 milligrams per liter at 55 meters downstream of the discharge, and was 1,065 milligrams per liter at 400 meters downstream of the discharge. See Exhibit 5, Aquatic Biology Investigation, at Table 4. The lower of the two concentrations is 40 times greater than the maximum chloride level beyond which there would be a take of the Northern Riffleshell; the higher of the two is just over 100 times greater.

111.    Waste Treatment Corporation's discharge into the Allegheny River, including but not limited to its discharge of total dissolved solids with high concentrations of chloride, has harmed or harassed, and continues to harm or harass, the Northern Riffleshell and its habitat, thereby constituting an unlawful take of an endangered species.

## Prayer For Relief

Clean Water Action respectfully requests that this Court:

A. Declare that Waste Treatment Corporation violated and is in violation of the Clean Water Act, the Pennsylvania Clean Streams Law, and the Endangered Species Act as a result of the violations described above.

B. Issue a preliminary and permanent injunction that prevents Waste Treatment Corporation from operating the CWT Plant until such operation is lawful pursuant to the Clean Water Act, the Pennsylvania Clean Streams Law, and the Endangered Species Act.

C.  Require, in the form of an injunction or mandamus, that Waste Treatment Corporation, prior to resuming operation, must pay for and cause to be conducted a biological assessment of the affected and potentially affected mussels and mussel habitat.

D.  Require, in the form of an injunction or mandamus, that Waste Treatment Corporation remediate the damage done to the environment, natural resources, species, and habitat, as a result of its illegal discharges to the Allegheny River.

E.  Assess civil penalties against the Waste Treatment Corporation for $37,500 per day per violation for violations occurring after January 12, 2009, as provided in 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. Part 19 (adjustment of civil monetary penalties). Violations prior to January 13, 2009 may be assessed at up to $32,500 per day per violation, as provided in 69 Fed. Reg. 7124 (Feb. 13, 2004).

F.  Award Clean Water Action litigation costs, including attorney fees and expert fees, pursuant to Section 11 of the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and Section 505(d) of the Clean Water Act. 33 U.S.C. § 1365(d).

G.  Grant such other relief as the Court deems just and proper.

Date: October 28, 2013                 Respectfully submitted by,

                                       s/ Emily A. Collins
                                       Emily A. Collins, Esq.
                                       PA208990
                                       eac50@pitt.edu

                                       s/ Oday Salim
                                       Oday Salim, Esq.
                                       PA309542
                                       ods4@pitt.edu

                                       Environmental Law Clinic of the
                                       University of Pittsburgh School of Law

                                       (412) 648-1300 office
                                       (412) 648-1992 fax

For U.S. Mail:
P.O. Box 7226
Pittsburgh, PA 15213-0221

For other mail:
Sennott Square, Suite 5220
210 S. Bouquet St.
Pittsburgh, PA 15260

*Counsel for Clean Water Action*